# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 16, 2019          Decided June 11, 2019

No. 18-1195

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
NATIONAL COUNCIL, 118-ICE,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
IMMIGRATION AND CUSTOMS ENFORCEMENT,
INTERVENOR

———

On Petition for Review of a Final Order
of the Federal Labor Relations Authority

———

*T. Reid Coploff* argued the cause and filed briefs for the petitioner.

*Tabitha G. Macko*, Attorney, Federal Labor Relations Authority, argued the cause for the respondent. *Rebecca J. Osborne*, Acting Deputy Solicitor, was with her on brief.

*Joseph F. Busa*, Attorney, United States Department of Justice, argued the cause for the intervenor. *H. Thomas Byron III*, Attorney, and *Mark A. Robbins*, General Counsel, United

States Office of Personnel Management, were with him on brief.

Before: HENDERSON, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: At the urging of the Office of Special Counsel and the Government Accountability Office, the Department of Homeland Security, Immigration and Customs Enforcement (ICE) changed how it calculates overtime pay for certain employees. Concerned by the potential drop in its members' overtime pay, the American Federation of Government Employees National Council, 118-ICE (Union) representing ICE employees filed a grievance against ICE for changing its policy without first bargaining. The Federal Labor Relations Authority (Authority), however, determined that ICE had no duty to bargain with the Union before changing its overtime policy because ICE's previous policy was unlawful. *In re U.S. Dep't of Homeland Sec. U.S. Immigration & Customs Enf't* (*In re ICE*), 70 F.L.R.A. 628, 630 (2018). We agree with the Authority and therefore deny the Union's petition for review.

## I. BACKGROUND

Federal law governing overtime pay generally requires a federal employee to obtain administrative approval before working over eight hours in one day or forty hours in one workweek. 5 U.S.C. § 5542(a); 5 C.F.R. § 550.111(a)(1). Some federal employees, such as law enforcement personnel, however, hold positions "in which the hours of duty cannot be controlled administratively" because the employees must work "substantial amounts of irregular, unscheduled overtime." 5 U.S.C. § 5545(c)(2). To compensate federal employees for

this "Administratively Uncontrollable Overtime" or "AUO," the Congress authorized agencies to provide a special "premium pay" equal to "an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position." *Id.*

The Congress delegated to the Office of Personnel Management (OPM) the authority to promulgate regulations governing the calculation of AUO premium payments. 5 U.S.C. § 5548(a). In 1968, the OPM adopted a policy under which the amount of the premium payment turns on the average number of AUO hours an eligible employee works per week. *See* Revision of Regulations, 33 Fed. Reg. 12,402, 12,462–64 (Sept. 4, 1968) (codified as amended at 5 C.F.R. §§ 550.151– 550.164). Eligible employees receive a premium payment based on the following table:

| Average Weekly AUO | Premium Payment (As a Percentage of Base Pay) |
| --- | --- |
| At least 3 but not more than 5 hours | 10% |
| More than 5 but not more than 7 hours | 15% |
| More than 7 but not more than 9 hours | 20% |
| More than 9 hours | 25% |

*See* 5 C.F.R. § 550.154(a). An agency must review its employees' average weekly AUO "at appropriate intervals." *Id.* § 550.161(f). If an employee's average changes during the applicable review period, the agency must "discontinu[e] payments or revis[e] rates of premium pay" as necessary. *Id.*

Although the OPM's regulations linked AUO premium payments to an employee's average weekly AUO, the

regulations did not originally specify how to account for leave time in that calculation. *See id.* §§ 550.153–550.162. How an agency accounts for leave time, however, can directly affect an employee's premium payments. That is, if an agency counts leave time toward the length of the applicable review period, an employee's average weekly AUO and corresponding premium payment can drop.

To illustrate, an employee accumulating 72 hours of AUO over a 12-week review period would average 6 hours of AUO per week and therefore would receive a premium payment equal to 15% of his base pay rate. But if the same employee maintains his 6-hours-per-week average for ten weeks and takes two weeks of leave during which he accumulates no AUO, a total of 60 hours of AUO accumulates. If the agency does not exclude the two weeks of leave, the employee would see his average weekly AUO for the 12-week review period fall to 5 hours per week and his premium payment drop to 10%. On the other hand, if the agency excludes the two weeks, the employee's average weekly AUO for the now-reduced 10-week review period would remain at 6 hours per week and his premium payment would hold steady at 15%.

To resolve any uncertainty under its regulations, the OPM issued a guidance in 1997 instructing all federal agencies *not* to exclude leave time from their calculation of average weekly AUO. *See* Attachment to Memorandum from Steven R. Cohen, Acting Assoc. Dir. for Human Res. Sys., OPM, to Dirs. of Personnel, Guidance on AUO Pay (CPM 97-5) (June 13, 1997) (hereinafter "1997 Guidance"). Specifically, the 1997 Guidance clarified that "in determining the number of weeks in a review period," agencies should not "reduce the number of weeks by subtracting," *inter alia*, "hours of paid leave (such as annual leave or sick leave)" or "hours of unpaid leave (such as hours of leave without pay, including leave without pay under

the Family and Medical Leave Act of 1993 (FMLA), or hours during which an employee is suspended without pay)." 1997 Guidance at 4.[1]

Despite the OPM's 1997 Guidance, ICE—following the lead of the Immigration and Naturalization Service, its predecessor—continued to exclude leave time such as military leave, annual leave and sick leave from its AUO calculations. ICE's AUO policy remained unaddressed for over a decade but government oversight agencies eventually began to take notice. In 2013 the Office of Special Counsel, acting pursuant to its authority under the Whistleblower Protection Act, 5 U.S.C. §§ 1211–1219, warned the Congress that the Department of Homeland Security (DHS) and its components such as ICE were abusing AUO premium pay. *See Abuse of Overtime at DHS: Padding Paychecks and Pensions at Taxpayer Expense: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 113th Cong. 14–22 (2013) (statement of Carolyn N. Lerner, Special Counsel, U.S. Office of Special Counsel). A year later, the Government Accountability Office reported that ICE administered AUO premium payments contrary to governing rules by, for example, continuing to "provide for excludable days during periods of leave including annual or sick leave, or for periods of leave without pay . . . [n]otwithstanding OPM's 1997 guidance." U.S. Gov't Accountability Office, GAO-15-95, *Department of Homeland Security: Continued Action Needed to Strengthen Management of Administratively*

---

[1] After the emergency response to the terrorist attacks on September 11, 2001, the OPM added three exceptions to its general no-exclusion policy: (1) temporary assignments that are not eligible for AUO, (2) temporary assignments for advanced training duty and (3) temporary assignments that are "directly related to a national emergency." Administratively Uncontrollable Overtime Pay, 67 Fed. Reg. 6640, 6641 (Feb. 13, 2002) (codified as amended at 5 C.F.R. §§ 550.154(c), 550.162(g)); *see* 5 C.F.R. § 550.162(c).

*Uncontrollable Overtime* 27 (2014). The DHS responded by informing its components that it was "ending the practice of using excludable days in a manner that is inconsistent with the governing regulations" and instructing them to "take immediate action to correct these ongoing and unauthorized practices." Memorandum from Chip Fulghum, Acting Deputy Under Sec'y for Mgmt., DHS, to Component Heads, Component Plans to Improve the Administration of Administratively Uncontrollable Overtime (AUO) in the Department of Homeland Security 2 (Jan. 7, 2015).

On May 2, 2015, ICE complied with the DHS's instructions and ended its policy of excluding leave time from its calculation of average weekly AUO. Email from Daniel Ragsdale, Deputy Dir., ICE, to all ICE Employees, Changes in Calculations of Administratively Uncontrollable Overtime (AUO) (May 2, 2015). ICE then notified its employees' Union and offered to engage in post-implementation bargaining regarding the change to its AUO policy. Unsatisfied with post-implementation bargaining, the Union filed a grievance against ICE alleging that ICE committed an unfair labor practice under the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. §§ 7101–7135, by unilaterally changing its AUO policy without first bargaining with the Union. ICE denied the grievance but an arbitrator ruled in the Union's favor and ordered ICE to reinstate its previous AUO policy and to bargain with the Union before making any future changes.

The Authority, however, set aside the arbitrator's award as contrary to law. *In re ICE*, 70 F.L.R.A. at 628–30; *see* 5 U.S.C. § 7122(a)(1) (authorizing Authority to "take such action . . . concerning the [arbitrator's] award as it considers necessary" if it finds award is "contrary to any law, rule, or regulation"). The Authority determined that ICE's previous

policy of excluding leave time from its AUO calculations was contrary to the OPM's regulations and the 1997 Guidance and that ICE thus had no duty under the FSLMRS to bargain with the Union before abandoning its unlawful practice. *In re ICE*, 70 F.L.R.A. at 630. The Union does not claim that ICE had an obligation to engage in impact and implementation bargaining before instituting the change. The Union timely petitioned for review of the Authority's order. *See* 5 U.S.C. § 7123(a).

## II. ANALYSIS

We will set aside the Authority's order if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *see id.* § 7123(c) ("Review of the Authority's order shall be on the record in accordance with section 706 of this title."). The Authority's order rests on two conclusions: (1) ICE's previous AUO policy was unlawful under the OPM's regulations and Guidance and (2) ICE therefore had no duty under the FSLMRS to bargain with the Union before changing its policy. *In re ICE*, 70 F.L.R.A. at 630. The Union does not dispute that the second conclusion correctly states the applicable law if the first conclusion is substantiated. *See* 5 U.S.C. § 7117(a)(1) ("[T]he duty to bargain in good faith" does not extend to matters "inconsistent with any Federal law or any Government-wide rule or regulation."). Thus, whether we should set aside the Authority's decision turns entirely on whether it correctly determined that ICE's previous policy conflicted with the OPM's regulations as interpreted in the 1997 Guidance.

On its face, the OPM's 1997 Guidance expressly prohibits ICE's previous policy of excluding leave time from its AUO calculations. The 1997 Guidance states that "in determining the number of weeks in a review period, there is *no authority*

to reduce the number of weeks by subtracting hours of paid leave (such as annual leave or sick leave)" or "hours of unpaid leave (such as hours of leave without pay, including leave without pay under the Family and Medical Leave Act of 1993 (FMLA), or hours during which an employee is suspended without pay)." 1997 Guidance at 4 (emphasis added). In 2002, the OPM amended its AUO regulations, creating a limited set of exceptions from its no-excludible-days policy to address exigencies related to the September 11, 2001 terrorist attacks. *See* Administratively Uncontrollable Overtime Pay, 67 Fed. Reg. at 6640–41. The OPM's decision that these changes were "necessary" to keep employees temporarily assigned to non-AUO qualifying positions from experiencing reductions in their AUO rates, *id.* at 6640, confirmed the default rule reflected in the 1997 Guidance that agencies otherwise lack discretion to exclude days. ICE's previous policy of excluding leave time was therefore unlawful under a straightforward reading of the 1997 Guidance and the 2002 amendments to the regulations. Nevertheless, the Union makes three arguments that support its position that ICE's previous AUO policy was consistent with the 1997 Guidance. None is persuasive.

First, as a textual matter, the Union argues that the 1997 Guidance's prohibition on excluding leave extends only to *hours* of leave, preserving an agency's discretion to exclude *days* of leave. As evidence, the Union observes that, in identifying the units of time an agency should not exclude from its AUO calculations, the 1997 Guidance lists only "hours" of paid and unpaid leave but lists both "days" and "hours" "during which an employee has been detailed to other duties for which employees seldom or never perform irregular or occasional overtime work." 1997 Guidance at 4–5.[2] The Union draws

---

[2] The full relevant portion of the 1997 Guidance reads:

too much from too little. Both "hours" and "days" refer to units of time that can be used interchangeably, in this case with eight hours equaling one day. Indeed, the relevant portion of the 1997 Guidance assumes that the units of time are interchangeable by speaking of subtracting "hours" and "days" from a third unit of time, "weeks." *Id.* at 4. The Union, moreover, has offered no practical reason why the OPM would have intended an agency to treat employees who take partial days of leave differently from those who take full days—why, for example, an employee who calls in sick before work begins should be able to exclude his sick time but an employee who becomes ill at the office, leaves after lunch and takes four hours of sick leave should not. We thus read the 1997 Guidance as using different units of time to convey one concept: an agency should not exclude leave or other official time, whether measured in "hours" or "days," in calculating its employees' average weekly AUO.

Second, the Union asserts that a subsequent provision of the 1997 Guidance discussing "extended absence[s]" gives an

---

[I]n determining the number of weeks in a review period, there is no authority to reduce the number of weeks by subtracting *hours* of paid leave (such as annual leave or sick leave), *hours* of unpaid leave (such as *hours* of leave without pay, including leave without pay under the Family and Medical Leave Act of 1993 (FMLA), or *hours* during which an employee is suspended without pay), *hours* of excused absence with pay, *hours* or *days* during which an employee has been detailed to other duties for which employees seldom or never perform irregular or occasional overtime work, or *hours* in a training status.

1997 Guidance at 4–5 (emphases added).

agency some discretion in excluding leave time. *See id.* at 5. The Union, however, forfeited this argument by failing to raise it in its opening brief. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).

Third, the Union insists that "30 years" of "settled law" have recognized that ICE's previous policy of excluding leave time was lawful under the OPM regulations. But the decisions the Union cites do not constitute authority anywhere close to settled law. To start, the first two decisions on which the Union relies pre-date the 1997 Guidance by more than a decade and thus offer no assistance in determining whether ICE's previous policy of excluding leave time conflicts with the 1997 Guidance. *See Beeunas v. United States*, 1 Cl. Ct. 706 (1983); *In re Nat'l Border Patrol Council*, 23 F.L.R.A. 106 (1986). The two more recent Authority decisions the Union cites provide it no support because the Authority subsequently vacated both. *See In re Am. Fed'n of Gov't Emps.*, 70 F.L.R.A. 441 (2018) (vacating *In re Am. Fed'n of Gov't Emps.*, 69 F.L.R.A. 248 (2016), and *In re Am. Fed'n of Gov't Emps.*, 68 F.L.R.A. 910 (2015)).[3] In the end, the Union can point to no relevant decisions that create "settled law" establishing that ICE's previous AUO policy of excluding leave time was consistent with the 1997 Guidance.

---

[3] In response, the Union argues that it is irrelevant that the Authority vacated the two decisions because it did so for reasons unrelated to the lawfulness of excluding leave days. The Authority vacated the decisions pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). *See In re Am. Fed'n of Gov't Emps.*, 70 F.L.R.A. at 441 n.6. *Munsingwear* mootness is a doctrine specifically aimed at preventing a decision subsequently mooted "from spawning any legal consequences," *Munsingwear*, 340 U.S. at 41.

Perhaps seeing the writing on the wall, the Union belatedly suggested at oral argument that the 1997 Guidance does not reasonably implement the governing statute, 5 U.S.C. § 5545(c)(2), or the OPM regulations, 5 C.F.R. §§ 550.151–550.164, and thus does not render ICE's previous AUO policy unlawful. By failing to make this argument in its briefs, the Union forfeited the issue. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 n.6 (D.C. Cir. 2017).

For the foregoing reasons, we deny the Union's petition for review.

*So ordered.*